Neil M. Kliebenstein (SBN 226060)
Neil.kliebenstein@bowmanandbrooke.com
Samuel J. Galvin (SBN 336930)
Samuel.galvin@bowmanandbrooke.com
BOWMAN AND BROOKE LLP
1741 Technology Drive, Suite 200
San Jose, CA  95110-1364
Telephone:   (408) 279-5393
Facsimile:    (408) 279-5845

Attorneys for Defendant
Amtrust International Underwriters DAC

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMTRUST INTERNATIONAL UNDERWRITERS DAC, | Case No. |
| Plaintiff, | COMPLAINT FOR DECLARATORY JUDGEMENT |
| vs. | |
| 180 LIFE SCIENCES CORP., | |
| Defendant. | |

Plaintiff, AmTrust International Underwriters DAC ("AmTrust"), by and through its attorneys, BatesCarey LLP, and for its Complaint for Declaratory Judgment, states as follows:

## NATURE OF THE ACTION

1.      This is an insurance coverage dispute.   AmTrust seeks a declaration of its obligations under a Directors and Officers and Public Company Liability Policy it issued to KBL Merger Corp. IV ("KBL") under policy number EUC1001782 00 (the "Policy") with respect to: (1) 180 Life Sciences Corp.'s ("180 Life") reimbursement of Dr. Marlene Krauss and George Hornig with respect to costs incurred by Dr. Krauss and Mr. Hornig in responding to Subpoenas issued by the Securities and Exchange Commission (the "SEC Subpoenas"); and (2) a Counterclaim and Third-Party Complaint filed by Dr. Marlene Krauss ("Dr. Krauss") and KBL IV Sponsor, LLC

("Sponsor") against 180 Life in the Court of Chancery of the State of Delaware, Case No. 2021-0754 (the "Counterclaim and Third-Party Complaint").

2.      KBL and various entities entered into a business combination agreement, leaving 180 Life as the surviving entity, and resulting in a complete turnover of KBL's prior board of directors as of November 6, 2020.

3.      180 Life seeks coverage for the Counterclaim and Third-Party Complaint under the Policy.

4.      Pursuant to Section IX – Change of Control of the General Terms and Conditions,  the Policy does not apply to any **Claim**[1] alleging, in whole or in part, any **Wrongful Acts** committed, attempted or allegedly committed or attempted by any **Insured** subsequent to the date of a Change in Control, which occurs when either (1) the **Named Insured** consolidates with or merges into, or sells all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or (2) any person or entity or group of persons or entities acting in concert shall acquire **Management Control** of the **Named Insured** (the "Change in Control Provision").

5.      In their Counterclaim and Third-Party Complaint, Dr. Krauss and Sponsor allege that 180 Life committed several **Wrongful Acts** subsequent to the November 6, 2020 closing date that left 180 Life as the surviving entity, and resulted in a complete turnover of KBL's prior board of directors.  This constitutes a change in control such that AmTrust owes no coverage for the post-merger **Wrongful Acts** alleged in the Counterclaim and Third-Party Complaint under the Policy.

6.      In addition, 180 Life seeks coverage for its reimbursement of Dr. Krauss and Mr. Hornig with respect to costs incurred by Dr. Krauss and Mr. Hornig in responding to the SEC Subpoenas.

---

[1]      Terms in bold are defined in the Policy.

7.      180 Life is not an **Insured** under the Policy.  Moreover, the Change in Control provision precludes coverage for 180 Life's reimbursement requests as the SEC Subpoenas are investigating potential wrongful conduct occurring before and after the merger closing.

8.      As explained in more detail below, other terms, conditions, and/or exclusions of the Policy also bar or limit coverage for the matters.

## PARTIES

9.      AmTrust is a designated activity company organized and existing under the laws of Ireland, with its principal place of business in Dallas, Texas.

10.      AmTrust alleges on information and belief that 180 Life is a Delaware corporation with its principal place of business in Santa Clara County, California

## JURISDICTION AND VENUE

11.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332(a), 2201, and 2202, as complete diversity exists between the parties and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and AmTrust seeks declaratory relief with respect to a case of actual controversy within this Court's jurisdiction. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(1) and (2), in that 180 Life's principal place of business is within this judicial district.

## THE AMTRUST POLICY

12.      AmTrust issued the Policy, which is a claims-made policy, to KBL for the **Policy Period** June 7, 2017 to June 7, 2018.   Pursuant to amendment, the **Policy Period** was extended to November 9, 2020.   The Policy contains a Directors and Officers and Public Company Liability Coverage Element which provides an aggregate limit of liability of $3 million for all claims subject to a $250,000 per Securities Claim Retention, and a $150,000 "All other **Claims**" Retention.[2]   With respect to Coverage C, as described below, the Policy limits of

---

[2]      The each **Claim** retention under Coverage A in the Policy is $0.

liability are subject to a $150,000 Retention.  A true and accurate copy of the Policy is attached hereto as **Exhibit A**.

13. The Insuring Agreements in Section I. of the Directors and Officers and Public Company Liability Coverage Element, define the scope of coverage afforded by the Policy to include the following:

**Coverage A: Individual Insurance Coverage**

The **Insurer** shall pay **Loss** of an **Individual Insured** arising from a **Claim** first made against such **Individual Insured** during the **Policy Period** or the Extended Reporting Period, if applicable, for any actual or alleged **Wrongful Act** of such **Individual Insured**, except when and to the extent that a **Company** has indemnified the **Individual Insured** for such **Loss**

**Coverage B: Company Reimbursement Coverage**

The **Insurer** shall pay **Loss** of a **Company** arising from a **Claim** first made against an **Individual Insured** during the **Policy Period** or the Extended Reporting Period, if applicable, for any actual or alleged **Wrongful Act** of such **Individual Insured,** but only when and to the extent that such **Company** has indemnified such **Individual Insured** for such **Loss.**

**Coverage C: Company Coverage**

The **Insurer** shall pay **Loss** of a **Company** arising from a **Securities Claim** first made against a **Company** during the **Policy Period** or the Extended Reporting Period, if applicable, for any actual or alleged **Wrongful Act** of a **Company**.

14. Section IX. of the Policy's General Terms and Conditions, as amended by Endorsement No. 7, provides the following:

If during the **Policy Period**:

1. the **Named Insured** shall consolidate with or merge into any other entity or group of persons or entities acting in concert, or

2. any person or entity or group of persons or entities acting in concert shall acquire

**Management Control** of the **Named Insured,**

(1 and/or 2 herein referred to as a Change In Control), then this policy may not be cancelled thereafter and it shall not, in any event, apply to any **Claim** alleging in whole or in part any **Wrongful Acts** committed, attempted or allegedly committed or attempted by any **Insured** subsequent the date of such Change In Control.

COMPLAINT FOR DECLARATORY JUDGEMENT

15.     Section II.C. of the Policy's Directors and Officers and Public Company Liability Coverage Element, as amended by certain endorsements to the Policy, provides the following relevant definitions:

C.     **Claim** means

1.     a written demand, other than a **Derivative Demand**, for monetary, non-monetary or injunctive relief (including any request to toll or waive any statute of limitations);

2.     a civil, criminal, administrative or regulatory proceeding for monetary, nonmonetary or injunctive relief which is commenced by:

(i)     service of a complaint or similar pleading;

(ii)    return of an indictment, information or similar document (in the case of a criminal proceeding); or

(iii)   receipt or filing of a notice of charges;

3.     a civil, criminal, administrative or regulatory investigation of an **Individual Insured** by a federal, state, local or foreign law enforcement authority or the enforcement body of any securities exchange:

(i)     once such **Individual Insured** is identified in writing by such authority or enforcement body as a person against whom a proceeding described in paragraph 2 of this Definition may be commenced; or

(ii)    in the case of an investigation by the Securities and Exchange Commission ("SEC") or a similar state or foreign government authority, after:

(a)    the service of a subpoena upon such **Individual Insured**; or

(b)    the **Individual Insured** is identified in a written "Wells" or other notice from the SEC or a similar state or foreign government authority that describes actual or alleged violations of laws by such **Individual Insured**; or

4.     any country by another country for trial or to answer a criminal accusation, including the execution of a warrant for the arrest of an **Individual Insured** where such execution is an element of the extradition.

*     *     *

G.     **Executive** means

1.     any past, present or future duly elected or appointed director (including shadow director and de facto director), officer, trustee, regent, governor, management committee member of a duly constituted committee, member of the Board of Managers, Advisory Board, Supervisory Board or Audit Committee, board representative or board observer of a **Company**;

2.     any past, present or future person in a duly elected or appointed position in a **Company** which is organized and operated in a jurisdiction other than the United States of America or any of its territories or possessions that is

equivalent to an executive position listed in paragraph 1 of this Definition; or

3.  any past, present or future General Counsel or Risk Manager (or equivalent position) of the **Named Insured.**

H.  **Individual Insured** means any**:**

1.  **Executive**

2.  **Employee**; or

3.  **Outside Entity Executive**

I.  **Insured** means any:

1.  **Company**; or

2.  **Individual Insured.**

\*       \*       \*

K.  **Loss** means

1.  the amount that any Insured becomes legally obligated to pay in connection with any covered **Claim**, including, but not limited to:

    (i)  judgments (including pre-judgment and post-judgment interest on any covered portion thereof) and settlements; and

    (ii)  damages, including punitive or exemplary damages and the multiple portion of multiplied damages relating to punitive or exemplary damages.  The **enforceability** of this subparagraph (ii) shall be governed by such applicable law that most favors coverage for such punitive, exemplary and multiple damages;

2.  **Defense Costs** which the insured is legally obligated to pay, including any plaintiffs' attorney fees as part of a covered judgment or settlement;

3.  with respect to Coverage D of this **Coverage Element, Adverse Media Event Loss**;

4.  with respect to Coverage E of this **Coverage Element, Investigation Costs**

**Loss**, other than **Defense Costs**, shall not include:

1.  any amount for which the **Insureds** are not financially liable or which are without legal recourse to the **Insureds**;

2.  matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed; notwithstanding the Insurer shall not assert that in a **Securities Claim** asserting violations of Section 11, 12 and 15 of the Securities Act of 1933, as amended, or section 210 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, the portion of any amounts

incurred by the **Insureds** which is attributable to such violations constitutes uninsurable loss, and shall treat that portion of all such settlements, judgments and **Defense Costs** as constituting loss under this policy;

3. fines, penalties or taxes imposed by law; provided that **Loss** will specifically include:

   (a) civil penalties assessed against any **Insured Person** pursuant to Section 2(g)(2)(b) of the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-2(g)(2)(b), the United Kingdom's Bribery Act 2010 (2010 chapter 23), and Section 308 of the Sarbanes-Oxley Act of 2002 (15 U.S.C. 7246(a)); and

   (b) solely with respect to **Loss** to which Insuring Agreement (A) applies, fines, penalties or taxes that an **Insured Person** is obligated to pay if such fines, penalties or taxes are insurable by law and are imposed in connection with such **Insured Person's** service with an insolvent **Company**

4. the costs and expenses of complying with any injunctive relief or other form of nonmonetary relief;

5. compensation, salary, wages, fees, benefits, overhead, charges or expenses of any **Insured**;

6. any amounts owed pursuant to the terms of any contract or agreement, including any amounts related to any such exposures based on the contract or agreement;

7. any amount representing the increase in price or consideration where the **Claim** involves allegations that the price or consideration paid or offered to be paid for a merger, consolidation or acquisition of all or a majority of stock issued by or assets owned by any person or entity is inadequate or unfair; or

8. any reimbursement required under the Sarbanes-Oxley Act of 2002 or any rules, regulations or amendments promulgated thereunder, or any other type of reimbursement, restitution or disgorgement.

\* \* \*

O. **Securities Claim** means a **Claim** made against any **Insured**:

1. alleging a violation of any federal, state, local or foreign regulation, rule or statute regulating securities, including, but not limited to, the purchase or sale, or offer or solicitation of an offer to purchase or sell, securities which is:

   (i) brought by any person or entity alleging, arising out of, based upon or attributable to the purchase or sale of, or offer or solicitation of an offer to purchase or sell, any securities of a **Company**; or

   (ii) brought by a security holder of a **Company** with respect to such security holder's interest in securities of such **Company**; or

2. brought derivatively on behalf of a **Company** by a security holder of such **Company**.

COMPLAINT FOR DECLARATORY JUDGEMENT

P.   **Subsidiary** means

1. any for-profit entity in which the **Company** has or had **Management Control** on or before the inception date of the policy either directly or indirectly through one or more other **Subsidiaries;**

2. any for-profit entity in which the **Company** acquires **Management Control** during the **Policy Period,** either directly or indirectly through one or more other **Subsidiaries;** and whose assets do not exceed 35% of the assets of the **Company,** prior to the **Company** acquiring **Management Control** of the **Subsidiary;** or

3. any for-profit entity in which the Company acquires **Management Control** during the **Policy Period,** either directly or indirectly through one or more other **Subsidiaries** and whose assets exceed 35% of the assets of the **Company,** prior to the **Company** acquiring **Management Control** of the **Subsidiary** but only for a period of 90 days subsequent to the **Company** acquiring **Management Control** of the **Subsidiary.**

Q.   **Wrongful Act** means

1. any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act by an **Individual Insured** in their respective capacities as such, or in their capacity as a controlling person within the meaning of Section 15 of the Securities Act of 1933, as amended or Section 20(a) of the Securities Exchange Act 1934, as amended; or for any matter claimed against such **Individual Insured** by reason of his or her status as an **Executive, Employee,** or **Outside Entity Executive**; or

2. any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act by a **Company** in connection with a **Securities Claim**

16.   Section II. of the Policy's General Terms and Conditions provides the following relevant definitions:

B.   **Company** means (i) the **Named Insured;** (ii) any **Subsidiary;** and (iii) the **Named Insured** or any **Subsidiary** as a debtor-in-possession under United States of America bankruptcy law or similar legal status under foreign law.

**Company** does not include and coverage shall not apply under any Coverage Element to, any **Subsidiary,** or any **Executive** or **Employee** of any **Subsidiary** for any **Wrongful Act** committed, attempted, or allegedly committed or attempted, prior to or subsequent to such entity having met the definition of **Subsidiary** as defined in that **Coverage Element.**

*        *        *

F.     **Indemnifiable Loss** means **Loss** for which the **Company** or **Outside Entity** is permitted or required to indemnify or advance to the **Individual Insureds**.

17.     Section III. Of the Policy's Directors and Officers and Public Company Liability Coverage Element, as amended by certain endorsements to the Policy, provides the following relevant exclusions:

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured**:

A.     alleging, arising out of, based upon or attributable to:

1.     gaining of any personal profit, remuneration or financial advantage to which the **Insured** was not legally entitled, as established in any final non-appealable adjudication in the underlying action;

2.     purchase or sale by an **Insured** of securities of the **Company** within the meaning of Section 16(b) of the Securities Exchange Act of 1934 and amendments thereto or similar provisions of any state statutory law, if any final non-appealable adjudication in the underlying action establishes that such Section 16(b) violation occurred;

3.     payment to any **Insured** of any remuneration without the previous approval of the security holders of the **Company**, if any final non-appealable adjudication in the underlying action establishes such payment was illegal; or

4.     committing of any deliberate criminal or deliberate fraudulent act, or any willful violation of any statute, rule or law, if any final non-appealable adjudication in the underlying action establishes that such deliberate criminal or deliberate fraudulent act, or willful violation of statute, rule or law was committed.

For purposes of determining the applicability of this Exclusion, (i) the facts pertaining to and knowledge possessed by any **Insured** shall not be imputed to any **Individual Insured**; and (ii) only facts pertaining to and knowledge possessed by any past or present chief executive officer or chief financial officer (or equivalent positions) of a **Company** shall be imputed to such **Company**;

*      *      *

E.     alleging, arising out of, based upon or attributable to any actual or alleged act, error or omission of an **Individual Insured** serving in any capacity other than as an **Executive** or **Employee** or as an **Outside Entity Executive;**

F.     which is brought by or on behalf of a **Company, Outside Entity** or any **Executive** or **Outside Entity Executive;** or which is brought by any security holder of the **Company** or **Outside Entity** or any director, officer, trustee or governor of such **Outside Entity,** whether directly or derivatively, unless such security holder's

**Claim** is instigated and continued totally independent of, and totally without the solicitation, assistance, active participation or intervention of any **Company, Outside Entity, Executive** or **Outside Entity Executive** or any director, officer, trustee or governor of such **Outside Entity.** This Exclusion shall not apply to:

1. any **Claim** brought by an **Executive** or **Outside Entity Executive** in the form of a cross-claim or third-party claim for contribution or indemnity which is part of and results directly from a **Claim** which is covered by this policy;

2. any **Claim** brought by the examiner, trustee, receiver, liquidator, rehabilitator or member of a creditors committee (or any assignee thereof) of such **Company** or **Outside Entity** in any bankruptcy proceeding by or against such **Company** or **Outside Entity;**

3. any **Claim** brought by any past **Executive** of a **Company** provided that he or she has not served as an **Executive,** General Counsel, Risk Manager or consultant of a **Company** at any time during the two years prior to the **Claim** being first made against any **Insured** and provided it is brought without the solicitation, assistance, active participation or intervention of any current **Executive** of a **Company** or anyone who has served in such capacity during the two years prior to the **Claim** being first made

4. any **Claim** brought by an **Executive** of a **Company** formed and operating in a jurisdiction other than the United States of America or any of its territories or possessions, or an **Outside Entity Executive** of an **Outside Entity** formed and operating in a jurisdiction other than the United States of America or any of its territories or possessions, against such **Company, Executive, Outside Entity** or **Outside Entity Executive** thereof, provided that such **Claim** is brought and maintained outside the United States of America or any of its territories or possessions, Canada or any other common law country (including any territories thereof);

5. any **Claim** brought by an **Outside Entity** or any director, officer, trustee or governor of such **Outside Entity** against a **Company, Executive** or **Employee;** or

6. any **Claim** brought by an **Executive** or **Outside Entity Executive** protected as a whistleblower under applicable laws or regulations;

18. Section VIII. of the General Terms and Conditions, as amended by Endorsement No. 24, provides, in relevant part, as follows:

2. Notwithstanding anything contained in the policy to the contrary, the coverage afforded by this policy shall not apply to

a. any **Wrongful Act,** (including any **Related Wrongful Acts** any of which were), committed or alleged to have been committed,

b. any **Adverse Media Event** occurring,

c.       any matter which could involve the payment of **Voluntary Compliance Loss** under the Fiduciary Liability **Coverage Element** occurring, or

d.       any **Derivative Demand**

made subsequent to November 9, 2020.

### **FACTUAL BACKGROUND**

19.       As of April of 2019, KBL was operating as a special purpose acquisition company ("SPAC") under former management including, but not limited to, Dr. Krauss as an officer and director of KBL.

20.       On April 10, 2019, KBL entered into a written "Term Sheet For KBL Business Combination With CannBioRex" (the "Term Sheet") by and between KBL, Sponsor, CannBioRx Life Sciences Corp. ("CannBioRx") and Tyche Capital LLC ("Tyche"), which Dr. Krauss executed on behalf of KBL in her then capacity as CEO of KBL.

21.       On or about July 25, 2019, KBL, CannBioRx, Katexco Pharmaceuticals Corp. ("Katexco"), CannBioRex Pharmaceuticals Corp. ("CBR Pharma"), 180 Therapeutics L.P. ("180 Therapeutics", together with Katexco and CBR Pharma, the "CannBioRx Subsidiaries"), KBL Merger Sub, Inc. ("KBL Merger Sub"), and the stockholder representatives for the stockholders of CannBioRx entered into a "Business Combination Agreement."

22.       On November 6, 2020, the Business Combination Agreement was completed wherein 180 Therapeutics, Katexco, and CBR Pharma became subsidiaries of CannBioRx. CannBioRx then merged with the KBL Merger Sub, which ceased to exist, and CannBioRx became a wholly-owned subsidiary of KBL.

23.       Upon the November 6, 2020 closing, the former stockholders of CannBioRx became the controlling stockholders of KBL, which then changed its name to 180 Life.

24.       Concurrent with the closing, Dr. Krauss and the KBL board of directors resigned their positions and many of the board of directors for CannBioRx became 180 Life's new board of directors.

/ / /

**I.     The Underlying Complaint, Counterclaim and Third-Party Complaint**

25.     On September 1, 2021, 180 Life filed a Complaint against Dr. Krauss, Sponsor, and KBL Healthcare Management, Inc. in the Court of Chancery of the State of Delaware, Case No. 2021-0754, alleging that Dr. Krauss and two of her alter ego companies breached fiduciary duties, made false attestations of financial statements, and engaged in other unauthorized acts that caused 180 Life to suffer millions of dollars in damages (the "Underlying Complaint").   A true and accurate copy of the Underlying Complaint is attached hereto as **Exhibit B**.

26.     In the Underlying Complaint, 180 Life asserts that, prior to the closing and her agreed-upon resignation, Dr. Krauss attested to numerous financial statement of KBL that were knowingly false and failed to inform the auditors of KBL of substantial liabilities.

27.     In response to the Underlying Complaint, Dr. Krauss and Sponsor filed the Counterclaim and Third-Party Complaint alleging that 180 Life and individual defendants Marc Feldmann, Lawrence Steinman, James N. Wood, Teresa DeLuca, Frank Knuettel II, Pamela Marrone, Lawrence Gold, Donald A. McGovern, Jr., Russell T. Ray, Richard W. Barker, Shoshana Schendelman, and Ozan Pamir (collectively,  the "Company Defendants") improperly attempted to shift blame from themselves to Dr. Krauss for their failures to timely report and satisfy reasonable and legitimate IPO and merger-related expenses that 180 Life was aware prior to the closing of the Business Combination Agreement on November 6, 2020.  A true and accurate copy of the Third-Party Complaint is attached hereto as **Exhibit C**.

28.     Specifically, Dr. Krauss and Sponsor allege that 180 Life failed to disclose certain liabilities payable at the closing (the "Deferred Closing Costs"), which should have been filed as liabilities by the Company Defendants and not KBL or Dr. Krauss prior to the closing.

29.     The Deferred Closing Costs included the following liabilities:

- Invoicing from Mintz, Levin, Cohn, Ferris, Glovsky and Popeo P.C. for past legal services to KBL in the amount of $1,472,070;

- Invoicing from EarlyBirdCapital, Inc. for a finders' fee to KBL in the amount of $1,750,000;

**COMPLAINT FOR DECLARATORY JUDGEMENT**

- Invoicing from Centri Business Consulting, LLC for services to KBL in the amount of $42,640;

- Invoicing from Alliance Global Partners for services to KBL in the amount of $537,777.94, plus warrants to purchase 63,658 share of KBL common stock;

- A debt to Cantor Fitzgerald & Co. for services to KBL in the amount of $1,500,000, for which KBL issued 150,000 shares of common stock on November 5, 2020 as payment;

- An alleged debt to Ladenburg Thalmann & Co., Inc. for services to KBL in the amount of $1,000,000, for which KBL issued 100,000 shares of common stock on November 5, 2020 as payment; and

- A Resignation Agreement dated June 12, 2020, between Dr. Krauss, KBL, and Tyche whereby Dr. Krauss agreed to resign from KBL in exchange for payment from KBL to herself of $500,000 in cash and the release of 500,000 shares of KBL common stock pledged in escrow for the benefit of Tyche.

30.    Dr. Krauss and Sponsor allege that the Deferred Closing Costs were disclosed to Company Defendants throughout the process leading up to the November 6, 2020 closing.

31.    Dr. Krauss and Sponsor allege that the 180 Life and the Company Defendants failed to report the Deferred Closing Costs in subsequent corporate filings with the SEC and repeatedly, and falsely blamed Dr. Krauss for 180 Life's failure to disclose the Deferred Closing Costs.

32.     Additionally, Dr. Krauss and Sponsor allege in the Counterclaim and Third-Party Complaint that 180 Life breached its fiduciary duties to its shareholders with respect to private placement share sales and breached its duties to Dr. Krauss with respect to the agreement to pay her $500,000 upon closing of the merger and her resignation.

33.    In the Counterclaim and Third-Party Complaint, Dr. Krauss and Sponsor allege the following six causes of action against 180 Life and the Company Defendants:

- First Cause of Action – Against Company Defendants for Breach of Fiduciary Duties
- Second Cause of Action – Against 180 Life for Breach of Contract – Registration Rights
- Third Cause of Action – Against 180 Life for Breach of Contract – Piggyback Rights

- Fourth Cause of Action – Against 180 Life for Breach of Contract – Resignation Agreement
- Fifth Cause of Action – Against 180 Life for Breach of Contract – Sponsor Promissory Note
- Sixth Cause of Action – Against Company Defendants for Declaratory Judgment

## II.    The SEC Investigation

34.    The SEC issued a letter dated April 15, 2021 to Dr. Jim Woody, the CEO of 180 Life, indicating that the SEC was conducting an investigation relating to the merger of KBL and "pre-merger" 180 Life (and related entities).   A true and accurate copy of the SEC's April 15, 2021 letter is attached hereto as **Exhibit D**.   The SEC letter attached a voluntary document request to 180 Life that sought information, documents and communications regarding the negotiations between KBL and "pre-merger" 180 Life leading up to the merger, as well as post-merger documents and communications concerning 180 Life, including all communications and documents concerning " 'transactions which were not recorded or disclosed by KBL during the Non-Reliance Period' identified in New 180's Forms 8-K filed with the SEC on December 31, 2020 and February 3, 2021," and "any actual or contemplated 'legal action against the former executives of KBL,' as described in New 180's 8-K filed with the SEC on December 31, 2020."

35.    The SEC subsequently issued six subpoenas dated between April 23, 2021 and May 6, 2021, each directed to one of the following: KBL Healthcare Management, Inc., KBL Healthcare Ventures, LP, Sponsor, Dr. Krauss, and/or Mr. Hornig.   True and accurate copies of the SEC Subpoenas attached hereto as **Exhibit E**.   Specifically, the following SEC Subpoenas were issued:

1)    April 23, 2021 SEC Subpoena addressed to KBL Healthcare Management, Inc.;

2)    April 23, 2021 SEC Subpoena addressed to KBL Healthcare Ventures, LP;

3)    April 23, 2021 SEC Subpoena addressed to KBL IV Sponsor LLC;

4)    April 23, 2021 SEC Subpoena addressed to Marlene Krauss;

5)    May 5, 2021 SEC Subpoena addressed to Marlene Krauss, c/o Harry H. Rimm, Esq.; and

6)    May 6, 2021 SEC Subpoena addressed to George R. Hornig.

36.     The SEC Subpoenas were issued by Matthew Meyerhofer, Staff Attorney at the SEC, and advise that the SEC is conducting an investigation in connection with the merger of KBL with 180 Life.   In general, the SEC Subpoenas request documents and information concerning KBL's merger discussions and negotiations with 180 Life, Katexco Pharmaceuticals Corp., CannBioRex Pharmaceuticals Corp., and/or 180 Therapeutics L.P.  The SEC Subpoenas also seek documents and information concerning KBL's communications with various entities involved with the KBL and 180 Life merger.   The SEC Subpoenas further note that the investigation is a non-public, fact-finding inquiry and that the investigation does not mean that the SEC has concluded that anyone has violated the law.

37.     Dr. Krauss has incurred fees and costs related to the SEC Subpoenas, and now seeks indemnification with respect to the legal costs she has incurred in responding to the SEC Subpoenas from 180 Life pursuant to the indemnity provision in KBL's articles of incorporation, which was adopted and unmodified by 180 Life after the merger.

## **INSURANCE COVERAGE DISPUTE**

38.     180 Life seeks insurance coverage from AmTrust under the Policy for the Counterclaim and Third-Party Complaint, as well as reimbursement of costs to Dr. Krauss and Mr. Hornig for the SEC Subpoenas.

39.     AmTrust disputes that coverage exists for the Counterclaim and Third-Party Complaint, and/or for the SEC Subpoenas, under the Policy.

40.     An actual, present, and bona fide controversy exists between AmTrust, on the one hand, and 180 Life and the Company Defendants, on the other hand, with respect to whether there is insurance coverage for the Counterclaim and Third-Party Complaint, and/or for the SEC Subpoenas, under the Policy.

41.     A judicial declaration is necessary to establish the parties' rights and duties, if any, under the Policy.

/ / /

/ / /

**COUNT I – DECLARATORY JUDGMENT**

**(180 Life Is Not a An Insured)**

42.     AmTrust incorporates by reference each and every allegation set forth in the preceding paragraphs 1 through 41 as though set forth fully herein.

43.     Pursuant to Section I. – Coverage C of the Policy's Directors and Officers and Public Company Liability Coverage Element, AmTrust shall pay the **Loss** of a **Company** arising from a **Securities Claim** first made against a **Company** during the **Policy Period** or the Extended Reporting Period, if applicable, for any actual or alleged **Wrongful Act** of the **Company**.

44.     Section II.I. of the Policy's Directors and Officers and Public Company Liability Coverage Element defines **Insured** to mean any **Company** or **Individual Insured**.

45.     Section II.B. of the Policy's General Terms and Conditions defines **Company**, in relevant part, to mean (i) the **Named Insured**; or (ii) any **Subsidiary**.  Moreover, Section II.B. provides that **Company** does not include and coverage shall not apply under any **Coverage Element** to any **Subsidiary**, or any **Executive** or **Employee** of any **Subsidiary** for any **Wrongful Act** committed, attempted, or allegedly committed or attempted, prior to or subsequent to such entity having met the definition of **Subsidiary** as defined in that **Coverage Element**.

46.     Section II.I. of the Policy's General Terms and Conditions defines **Named Insured** to mean the entity set forth in Item 1. of the General Declarations.  The only entity listed in Item 1. of the General Declarations is KBL

47.     Thus, 180 Life is not the **Named Insured** under the Policy.

48.     Section II.P. of the Policy's Directors and Officers and Public Company Liability Coverage Element defines **Subsidiary** to mean

> 1.     any for-profit entity in which the **Company** has or had **Management Control** on or before the inception date of the policy either directly or indirectly through one or more other **Subsidiaries;**

> 2.     any for-profit entity in which the **Company** acquires **Management Control** during the **Policy Period,** either directly or indirectly through one

or more other **Subsidiaries;** and whose assets do not exceed 35% of the assets of the **Company,** prior to the **Company** acquiring **Management Control** of the **Subsidiary;** or

3.    any for-profit entity in which the Company acquires **Management Control** during the **Policy Period,** either directly or indirectly through one or more other **Subsidiaries** and whose assets exceed 35% of the assets of the **Company,** prior to the **Company** acquiring **Management Control** of the **Subsidiary** but only for a period of 90 days subsequent to the **Company** acquiring **Management Control** of the **Subsidiary.**

49.    KBL never had **Management Control** over 180 Life, and therefore 180 Life is not a **Subsidiary** of KBL under any of the enumerated definitions above.

50.    Because 180 Life is not a **Company**, defined as the **Named Insured**, or a **Subsidiary**, it is not an **Insured** under the Policy, and therefore is not entitled to coverage under the Policy in relation to any indemnification obligation owed by 180 Life to Dr. Krauss and/or Mr. Hornig with respect to the SEC Subpoenas, and/or in relation to the Counterclaim and Third-Party Complaint.

## COUNT II – DECLARATORY JUDGMENT

### (Change In Control Provision)

51.    AmTrust incorporates by reference each and every allegation set forth in the preceding paragraphs 1 through 50 as though set forth fully herein.

52.    Section IX. Of the Policy's General Terms and Conditions, as amended by Endorsement No. 7 provides that the Policy does not apply to any **Claim** alleging in whole or in part any **Wrongful Acts** committed, attempted or allegedly committed by any **Insured** subsequent to the date on which, (1) the **Named Insured** shall consolidate with or merge into any other entity or group of persons; or (2) entities acting in concert or any persons or entities

/ / /

/ / /

/ / /

acting in concert shall acquire **Management Control**[3] of the **Named Insured** (the "Change in Control Provision").

53.     On November 6, 2020, KBL closed the business combination with CannBioRx (which changed its name to 180 Life Corp. in connection with the closing).  On that same date, in connection with the closing, KBL changed its name to 180 Life, and the former shareholders of 180 Life Corp. (formerly CannBioRx) became the controlling shareholders of 180 Life (formerly KBL) and KBL's former board of directors, including Dr. Krauss, were replaced.

54.     Therefore, pursuant to the Change in Control Provision, the Policy does not apply to any **Claim** alleging, in whole or in part, any **Wrongful Acts** committed by any **Insured** subsequent to November 6, 2020.  The Policy expired on November 9, 2020.

55.     In the Counterclaim and Third-Party Complaint, the damages for which Dr. Krauss and Sponsor seek relief are entirely based upon conduct of 180 Life Corp. (formerly CannBioRx) prior to the merger—*i.e.*, not conduct by KBL—or conduct by the new entity 180 Life (formerly KBL) post-merger.

56.     Specifically, Dr. Krauss and Sponsor allege:

- On November 12, 2020, 180 Life filed its 8-K in which it failed to disclose the Deferred Closing Costs for which they assert Dr. Krauss failed to disclose prior to the Closing.
- On November 24, 2020, 180 Life filed a 10-Q with SEC for the fiscal quarter ending September 30, 2020, as prepared by the Company Defendants but again failed to disclose the Deferred Closing Costs.  Dr. Krauss asserts that 180 Life and the Company Defendants subsequently "resorted to making demonstrably false and materially misleading claims that they were not aware of the Deferred Closing Costs and that the Deferred Closing Costs were reportable prior to the merger.
- On December 31, 2020, Dr. Krauss alleges that Company Defendants filed an 8-K in which they announced that the September 30, 2020 financial statements were unreliable and again falsely accused Dr. Krauss of being responsible.  On February 3, 2021, the Company Defendants filed another 8-K alleging similar unreliability as to 180 Life's (then KBL) financial statements for the period ending

---

[3]     Section II.H. of the General Terms and Conditions defines **Management Control** to mean: (i) owning interests representing more than 50% of the voting, appointment or designation power for the selection of a majority of: the board of directors of a corporation, the management committee members of a joint venture or partnership, or the members of the management board of a limited liability company; or (ii) having the right, pursuant to written contract or the by-laws, charter, operating agreement or similar documents of a **Company,** to elect, appoint or designate a majority of: the board of directors of a corporation, the management committee of a joint venture or partnership, or the management board of a limited liability company.

June 30, 2020.  Dr. Krauss alleges that Company Defendants made similar false and misleading statements in SEC filings on February 5, 2021, February 18, 2021, and July 9, 2021.

- On February 19, 2021, 180 Life sold approximately 2,564,000 shares of common stock in a private placement in public equity (the "February PIPE"), and subsequently, on February 23, 2021, entered into the February PIPE Registration Rights Agreement.  Dr. Krauss and Sponsor allege that the February PIPE Registration Rights Agreement itself breached the registration rights of shareholders of their valuable, bargained-for rights by containing a "no piggyback" provision.
- On July 20, 2021, 180 Life breached the terms of the Sponsor Registration Rights Agreement by failing to provide written notice of the February Form S-1.
- On July 30, 2021, Dr. Krauss demanded registration of her Sponsor Registrable Shares and further notified 180 Life that it failed to provide notice or opportunity to register those securities in breach of the Registration Rights Agreement, and failed to provide the Sponsor Shareholders with notice of her July 30 demand.
- On August 19, 2021, 180 Life sold 2,500,000 shares in another private placement in public equity, again including a "no piggyback" provision and thus again allegedly breaching the registration rights of the Sponsor Shareholders.

57.   Finally, Dr. Krauss alleges that 180 Life breached its agreement to pay her the remaining $300,000 upon closing in consideration for her resignation.

58.   To the extent each of the above acts or omissions constitute **Wrongful Acts** committed by any **Insured**, they occurred *after* the November 6, 2020 merger, and thus, pursuant to the Change in Control Provision, are not covered under the Policy.

59.   Additionally, with respect to the SEC Subpoenas, the Change in Control Provision broadly applies to any **Claim** alleging *in whole or in part* **Wrongful Acts** committed, attempted or allegedly committed by any **Insured** subsequent to the change in control, *i.e.*, the November 6, 2020 merger.

60.   The SEC Subpoenas, and the SEC Investigation that more broadly involved 180 Life, at least in part, seek information and communications regarding 180 Life's post-merger conduct, thus triggering the Change in Control Provision.

61.   Accordingly, there is no coverage available under the Policy to 180 Life in relation to the Counterclaim and Third-Party Complaint or the reimbursement of costs incurred by Dr. Krauss or Mr. Hornig in responding to the SEC Subpoenas.

/ / /

/ / /

**COUNT II – DECLARATORY JUDGMENT**

**(Exclusion – Insured vs. Insured)**

62.     AmTrust incorporates by reference each and every allegation set forth in the preceding paragraphs 1 through 61 as though set forth fully herein.

63.     Section III.F. of the Directors and Officers and Public Company Liability Coverage Element provides, in relevant part, that AmTrust shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured** which is brought by or on behalf of a **Company** or **Executive**.  The exclusion does not apply to any **Claim** brought by an **Executive** in the form of a cross-claim or third-party claim for contribution or indemnity which is part of and results directly from a **Claim** which is covered by the Policy (the "Insured vs. Insured Exclusion").

64.     Dr. Krauss qualifies as an **Executive** under the Policy, which is defined to include any past, present or future duly elected appointed director, officer, or member of the Board of Managers of a **Company**.

65.     Mr. Hornig qualifies as an **Executive** under the Policy, which is defined to include any past, present or future duly elected appointed director, officer, or member of the Board of Managers of a **Company**.

66.     With respect to the Counterclaim and Third-Party Complaint Dr. Krauss has brought a **Claim** against 180 Life that does not seek contribution or indemnity.

67.     With respect to the SEC Subpoenas, Dr. Krauss sought indemnity from 180 Life in the Indemnity Action; however, the exception to the Insured vs. Insured Exclusion requires that the **Claim** for indemnity be styled as a Counterclaim or Third-Party Complaint.  Dr. Krauss' and Mr. Hornig's request for reimbursement of costs incurred in responding to the SEC Subpoenas was not asserted against 180 Life in a Counterclaim or Third-Party Complaint, and therefore the exception does not apply.

68.     Accordingly, to the extent 180 Life constitutes an **Insured**, which it does not, the Insured vs. Insured Exclusion applies to preclude coverage for the Counterclaim and Third-

Party Complaint as well as the reimbursement to Dr. Krauss and/or Mr. Hornig for costs incurred in responding to the SEC Subpoena.

### COUNT III – DECLARATORY JUDGMENT

#### (Other Insurance/Allocation)

69.      AmTrust incorporates by reference each and every allegation set forth in the preceding paragraphs 1 through 68 as though set forth fully herein.

70.      Section VII of the Directors and Officers and Public Company Liability Coverage Element, as amended by endorsement, provides in relevant part that, insurance provided by the Directors and Officers and Public Company Liability Coverage Element shall apply only as excess over any other valid and collectible insurance, except for any personal umbrella policy purchased by an **Executive,** unless such other insurance is expressly written to be excess over any applicable Limit of Liability for this policy or any **Coverage Element.**  The Policy specifically shall be excess of any other policy pursuant to which any other insurer has a duty to defend a **Claim** for which this policy may be obligated to pay **Loss.**  For any **Claim** involving an **Outside Entity Executive,** this policy specifically shall be excess of any indemnification by the **Outside Entity** and any insurance coverage afforded to any such **Outside Entity Executive** or **Outside Entity.**

71.      To the extent 180 Life has other valid and collectible insurance available to it for the Counterclaim and Third-Party Complaint or the reimbursement request arising out of the SEC Subpoenas, the Policy will only provide coverage excess of such insurance.

72.      To the extent that the Counterclaim, Third-Party Complaint or SEC Subpoenas are found to involve both covered and uncovered matters, pursuant to Section VII of the Directors and Officers and Public Company Liability Coverage Element AmTrust is entitled to an allocation between covered and uncovered matters.

WHEREFORE, Plaintiff AmTrust prays that this Court enter a judgment in its favor and against Defendant 180 Life, awarding the following relief:

a.   A declaration that no coverage is available for the Counterclaim and Third-Party Complaint under the Policy;

b.   A declaration that no coverage is available for 180 Life's reimbursement of Dr. Krauss' expenses incurred in responding to the SEC Subpoenas;

c.   A declaration that no coverage is available for 180 Life's reimbursement of Mr. Hornig's expenses incurred in responding to the SEC Subpoenas;

d.   For costs of suit incurred herein; and

e.   For such other and further relief at law or in equity that the Court deems just and proper.

## RESERVATION OF RIGHTS

The Policy contains terms, conditions, and exclusions that may be relevant but that are not currently implicated by this declaratory judgment action. Nothing in this Complaint should be construed as a waiver by AmTrust of any coverage defenses at law, in equity, or under the Policy.  AmTrust continues to reserve all rights with respect to any claim for coverage made under the Policy where appropriate, and waives none.

## JURY DEMAND

AmTrust demands a jury trial.

Dated:  June 29, 2022

BOWMAN AND BROOKE LLP

Neil M. Kliebenstein
Attorneys for Defendant
Amtrust International Underwriters DAC

COMPLAINT FOR DECLARATORY JUDGEMENT